**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | | |
|---|---|---|
| **MAVENI ANGILAU,** | * | **Case No. 2:16-00992-JED** |
| **OTUFANGAVALU ANGILAU, and** | * | |
| **ESTATE OF SIALE ANGILAU,** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | **O R D E R** |
| **v.** | * | |
| | * | **Magistrate Judge Paul J. Cleary** |
| **UNITED STATES OF AMERICA,** | * | |
| **JANE DOE, et al.,** | * | |
| | * | |
| **Defendants.** | * | |

Before the Court are the Defendant United States of America's (hereafter, "Defendant USA" or "Government") Motion to File Video Under Seal (Motion to Seal") [ECF #12] and Plaintiffs' Motion to Unseal Courtroom Video and Modify the Court's Interim Order[1] ("Motion to Unseal") [ECF #48]. For the reasons set forth below, the Motion to Seal is **GRANTED IN PART AND DENIED IN PART**, and the Motion to Unseal is likewise **GRANTED IN PART AND DENIED IN PART**. After balancing the competing interests of the public and the Government, the Court holds that ECF #36, Attachment #8/Exhibit "F" shall

---

[1] The Interim Order (ECF #32) is a protective order entered by U.S. Magistrate Judge Craig B. Shaffer. The Interim Order permitted discovery and document exchange to go forward while the Court withheld a decision on sealing certain exhibits pending the development of an evidentiary record for *in camera* review. (ECF # 32, pp. 14-15).

be unsealed and made publicly available.[2]  The remaining videos and exhibits

at issue shall remain under seal for the protection of persons who would

otherwise be identified.

## I.  BACKGROUND

The issue presented by the pending motions is whether a video or videos

of the events that transpired in a federal courtroom on April 21, 2014, should

be made available to the public or should remain under seal.[3]  The videos show

Siale Angilau ("Angilau") rush an unarmed and handcuffed witness during that

witness' testimony on the first day of Angilau's criminal RICO[4] trial.  A Deputy

U.S. Marshal fired four shots at Angilau during the attack, hitting him with all

four. Angilau died either in transit to or at the hospital.  Angilau's family and

estate have filed this lawsuit, alleging violation of Angilau's civil rights as the

result of the Deputy U.S. Marshal's use of excessive force. [ECF #2].

---

[2]      This exhibit is the *pixelated* version of the 24-second courtroom video,
which culminates in Angilau's shooting.

[3]      Defendant has submitted a total of four video exhibits to the Court in
support of the Motion to Dismiss/Summary Judgment (ECF #36):  Attach.
#3/Exh. "A" – the un-pixelated one-hour video of the entirety of events on April
21, 2014; Attach. #4/Exh. "B" – pixelated one-minute video of events shortly
before and after the Angilau shooting; Attach. #7/Exh. "E" – un-pixelated 24-
second video of the Angilau shooting with and without aligned sound; and
Attach. #8/Exh. "F" – pixelated 24-second video with and without aligned
sound.  "Aligned sound" consists of overlaying the Court Reporter's recording of
courtroom events with the Marshal's service video.  In this Order, in discussing
the video at issue, the Court is referring to either the 24-second pixelated (Exh.
"F") video with sound, or the 24-second un-pixelated video (Exh. "E") with
sound.

[4]      Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, *et
seq.*

The investigation that led to Angilau's indictment on RICO charges began ten to fifteen years ago.[5]  In the early 2000's, Salt Lake City law enforcement officials became aware of a group called the Tongan Crip Gang ("TCG"). Authorities suspected the TCG of various criminal activities, including convenience store robberies, drug trafficking, vehicle theft, assaults, murder, and attempted murder.  In 2007, federal agents began a racketeering investigation targeting leaders of the TCG.  By that time, Angilau had come to the attention of state and federal law enforcement officers in Salt Lake City.

Angilau became the subject of law enforcement scrutiny due to his alleged involvement in two crimes:  (1) the first ("the 7-Eleven incident") occurred on July 24, 2007; and (2) the second (the "assault of a federal officer matter") occurred on August 11, 2007.  In the 7-Eleven incident, Angilau and other TCG members entered a Salt Lake City convenience store and began stealing beer from a cooler in the rear of the store.  During the course of the robbery, a TCG member shot and critically injured a 7-Eleven store employee.

In the assault of a federal officer matter, federal law enforcement officers were following a Jeep Cherokee driven by Angilau.  When the officers turned on their emergency lights and signaled the Jeep to stop, a passenger in the vehicle fired several shots at the officers' vehicle.  The officers were forced to abort their pursuit, and Angilau and the others escaped.  Later, however, Angilau and the others were arrested at a Salt Lake City home.

---

[5]     The following summary is based largely  on the *Order and Memorandum Decision* of U.S. District Judge Tena Campbell filed in 08-CR-431 (ECF #297), 08-CR-758 (ECF #1325), and 12-CV-138 (ECF #3).

These two specific criminal incidents provided grounds for multiple criminal filings against Angilau. In March 2008, he was charged in Utah State Court in connection with the assault of a federal officer matter. Angilau pleaded guilty to charges of obstruction of justice and failure to stop at the command of police. He was sentenced to one to fifteen years on the obstruction charge and zero to five years on the failure to stop charge. The sentences were to run concurrently.[6] As part of the plea proceeding in State Court, state prosecutors agreed to recommend that no additional federal charges be filed; nevertheless, federal prosecutors charged Angilau three times thereafter:

(1) **July 2, 2008:** In *United States v. Viliami Loumoli, et al.*, Case No. 08-CR-431, prosecutors charged Angilau in connection with the 7-Eleven incident (Hobbs Act robbery and brandishing a firearm in relation to a crime of violence);

(2) **September 17, 2008:** In *United States v. Viliami Loumoli and Siale Angilau*, Case No. 08-CR-499, prosecutors brought charges related to the assault on a federal officer matter (assault on a federal officer, brandishing/discharging a firearm in relation to a crime of violence); and,

---

[6] *State of Utah v. Siale Maveni Angilau*, Case No. 07-1905854 (Salt Lake County March 24, 2008).

**(3) May 2, 2010:** In *United States v. Eric Kamahele, et al.*, Case No. 08-CR-758, Angilau was one of fifteen defendants charged under the Racketeer Influenced and Corrupt Organizations Act ("the RICO case").[7]

Angilau was being tried in the RICO case on April 21, 2014, when the shooting that is the subject of this case occurred. The RICO trial heightened security concerns at the newly opened U.S. courthouse. The Court implemented additional security measures, including seating the jury anonymously. The prosecution's lead-off witness, a former TCG gang member identified only as V.T., was not disclosed until the morning of the trial. About 20 minutes into V.T.'s testimony, Angilau rose from his seat, grabbed a pen or pencil from in front of his lawyer, and rushed the witness stand. As Angilau approached the front of the courtroom, a Deputy U.S. Marshal fired four shots in quick succession, killing the Defendant.

## II. PROCEDURAL HISTORY

The Complaint, filed by Angilau's family, alleges, among other things, that the Deputy Marshal used excessive force to stop Angilau's attack. A Motion for Summary Judgment is presently pending with the Court, and it is that motion that prompted the motions to seal or unseal the courtroom video.[8] [ECF # 36]. In the motion seeking to file the video under seal, Defendant USA seeks to limit both the public's access and Plaintiffs' access to all versions –

---

[7]    *See*, *supra* at n.2.

[8]    Defendant Jane Doe filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment on February 17, 2017. The Court subsequently converted this motion to a Motion for Summary Judgment. [ECF #68].

pixelated or un-pixelated – of the courtroom video. [ECF #12]. Plaintiffs object

to the motion to seal [ECF #14], and a coalition of Utah and other media

outlets have intervened in the case for the limited purpose of opposing sealing

of judicial documents and courtroom proceedings. [ECF #20].[9]

On December 23, 2016, after multiple conferences with the parties and the

submission of a proposed interim protective order, U.S. Magistrate Judge Craig

B. Shaffer entered an Interim Order restricting access to the courtroom video

"as *an interim measure.*" [ECF #32 at 12 (emphasis in original)]. Judge Shaffer

noted that Defendant USA was requesting two different types of relief and, after

discussion of the applicable law governing protective orders, entered an order

with respect to Plaintiffs' access to the video. Plaintiffs and Plaintiffs' counsel

were given access to all of the video evidence submitted as part of Defendant

Jane Doe's Motion to Dismiss, but they were prohibited from disclosing:

> (1) The personal identification of any individuals present in the
> video(s) not publicly disclosed; (2) the positioning of the cameras
> within the courtroom and areas not covered by the camera view
> (blind spots); (3) emergency evacuation procedures for judges and
> court staff; (4) the positioning of court security personnel within

---

[9] The media first asked for a copy of the courtroom video in 2015 – a year before this case was filed. In a letter dated September 2, 2015, Chief Judge David Nuffer informed counsel for the Salt Lake Tribune that the court could not release the video for a variety of reasons, including the limitations imposed by a Memorandum of Understanding between the Administrative Office of U.S. Courts ("AOUSC") and the U.S. Marshal Service, which, as part of its procedure for providing courtroom security, installed the camera that captured the shooting. Judge Nuffer emphasized that the decision to deny the request for release of the video was made "in my administrative position as chief judge, and is not made in any pending civil suit or discovery context." [ECF #12-4]. Judge Nuffer's letter was written well before this action and before the video became a judicial record and is not binding on the Court.

the courtroom; and (5) any emergency response procedures of court security personnel entering in and out of the courtroom.

*Id.* at 12-13.

The Interim Order also prohibited any public access to the video, providing that

Members of the general public and persons formally or informally associated with any media or news outlet are expressly prohibited from having any access to the video(s), any copies thereof, or the "visual contents" of the video(s), *unless or until the court orders otherwise.*

*Id.* (emphasis added). Judge Shaffer found that he did not have sufficient evidence to determine whether the video should be filed under seal, so his Interim Order also directed the Defendant to submit for *in camera* review "any documents, declarations, or other materials that it believes support an application of the law enforcement privilege" that Defendant cited in support of its Motion to Seal. [ECF #32 at 9].

Defendant USA submitted those materials to the Court in January 2017 [ECF #35] and supplemented in June 2017 [ECF #67].[10] During a telephonic status hearing held July 6, 2017, the undersigned advised the parties and the (then) proposed media Intervenors that the Court would address the Motion to Seal and Motion to Unseal the courtroom video together and render one opinion as to whether the video should remain under seal or be made public in some form. [ECF #76]. All parties indicated the issue was fully briefed. No

---

[10] In March 2017, District Judge David M. Ebel and Magistrate Judge Shaffer withdrew from the case. Thereafter, the case was reassigned to U.S. District Judge John E. Dowdell of the Northern District of Oklahoma, and on June 23, 2017, to the undersigned U.S. Magistrate Judge. [ECF #69].

supplemental materials were submitted.  On August 29, 2017, the Court conducted a three-hour hearing in Salt Lake City on the sealing motions.  [ECF #88].

### III.  THE DOCUMENTS AT ISSUE

The focus of the Motion to Seal, the Media Intervenors' Objection, and the Plaintiffs' Motion to Unseal is a group of four security videos taken during Angilau's trial.[11]  The videos were captured by a courtroom camera operated by the U.S. Marshal Service, pursuant to a Memorandum of Understanding with the AOUSC.

The issues presented to the Court are:  First, does the public have a right of access to the videos described below?  Second, does this right outweigh the countervailing interests articulated by the Government in favor of sealing?  Third, if the public's right outweighs the Government's interests, which of the 24-second videos – pixelated or un-pixelated – should be made public?

The exhibits that are the subject of the Court's analysis herein are ECF #36, Attach. 7/Exh. "E" (un-pixelated) and Attach. 8/Exh. "F" (pixelated).  These exhibits capture the critical 24 seconds of the shooting.  The un-pixelated video shows the faces of the judge, court employees, and security and law enforcement personnel as they clear the courtroom or call for medical help.

---

[11]  The Defendant United States' Motion to Seal references "a digital video recording," but does not clearly specify to which video recording the motion refers.  Likewise, the Plaintiffs' Opposition to the Motion to Seal and their Motion to Unseal refer to "the courtroom video" without specification.  Defendant seeks to keep sealed all four videos submitted in support of their Motions for Summary Judgment.  The four videos are described at note 2, *supra.*

In the pixelated version, the faces of people in the courtroom are blurred and unrecognizable. The 24-second videos do not show the jurors or their exit from the courtroom, nor do they show any particular emergency evacuation or security procedure. The videos begin with Angilau seated at defense table and end with Angilau lying on the courtroom floor after being shot. Each exhibit contains a copy of the respective video with and without synchronized sound.

Everyone involved agrees that the 24-second video – whether pixelated or un-pixelated – is key to this case. The parties and the Court have all cited the video as the critical document in resolving this case. The Plaintiffs cited to the video in their Complaint [ECF #2, ¶32] and Defendant submitted versions of the video to the Court in support of the Motion for Summary Judgment [ECF #36, Exh. "A"-"C", "E"-"F" and ECF #37 "A"-"C", "E"-"F"]. The Court itself noted the significance of the video when it limited discovery in this case stating

> The Court has viewed the 24-second video with audio, and it is clear enough to show what happened and in what sequence. And it is certainly clear enough to determine the events that immediately preceded the shooting, the number of shots fired, the timing between the shots, and which figure in the video shot Mr. Angilau. Assuming that Plaintiffs were able to obtain testimony that contradicts the video, it would be impermissible for the Court to credit such testimony in considering the defendants' summary judgment motions. *See Scott v. Harris*, 550 U.S. 372, 378-80 (2007).

[ECF #68, at 5-6].

Defendant contends that disclosure of the video to the general public will endanger the lives of law enforcement personnel and compromise U.S. Courthouse security procedures. The Media Intervenors seek the *pixelated* copy of the courtroom video, contending that its disclosure furthers the goals of

educating the public and building confidence in the operation of the judicial system.  Plaintiffs seek release of the un-pixelated video.

## IV.  APPLICABLE LEGAL PRINCIPLES

Defendant USA makes two general arguments in support of its motion to seal the video: (1) that the safety and security of those present in the courtroom that day – including Deputy U. S. Marshals, court security officers, the judge, and the jurors – will be compromised if the video is made publicly available; and (2) that the law enforcement privilege applies "to protect and maintain confidential courtroom security measures and law enforcement procedures." [ECF # 12 at 7-9].

The Intervenors argue that Defendant USA has failed to meet its burden to overcome the presumption of access to a judicial document, particularly one as critical as an exhibit to a motion for summary judgment.  [ECF # 21 at 3]. The Intervenors contend that they are entitled to access under both the common law and the First Amendment.  *Id.*

### 1.    Common Law Right of Access

It is clear that the public holds a long-recognized common law right to access judicial and other government records.  *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). *See also U.S. v. Pickard*, 733 F.3d 1297, 1302 (10th Cir. 2013) (*quoting Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1241 (10th Cir. 2012)); *U.S. v. McVeigh*, 918 F.Supp. 1452, 1457 (W.D.Okla. 1996) (noting that "Records of all agencies of government have historically been open to public inspection under the common law of this country.")  Under the common

law doctrine, judicial documents are presumptively open to the public, but may be closed or sealed if "countervailing interests heavily outweigh the public interests in access." *Mann v. Boatright*, 477 F.3d 1140, 1149 (10th Cir. 2007) (*quoting Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988).

The Tenth Circuit has held that, in deciding whether judicial records should be sealed, the court must first determine if the document at issue is a judicial document. A judicial document is a filed item "relevant to the performance of the judicial function and useful in the judicial process." *Bernstein v. Bernstein Litowitz, et al.*, 814 F.3d 132, 139 (2d Cir. 2016) (*quoting Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006)). It is enough that the document was submitted to the court for use in adjudication; it is not necessary that the court actually cite the document as the basis for its decision. *See Lugosch*, 435 F.3d at 123 (*citing In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 101 F.R.D. 34, 43 (C.D.Cal. 1984)) ("documents that the judge *should* have considered or relied upon, but did not, are just as deserving of disclosure") (emphasis in original)).

If the document is found to be a judicial document, there is a "strong presumption in favor of public access." *Pickard*, 773 F.3d at 1302.[12] The presumption is not absolute and may be outweighed by other countervailing interests. *See id. See also Colony*, 698 F.3d at 1241. If the document is a

---

[12] The standards articulated in *Pickard* apply to an initial request to seal a document and a request to unseal a judicial document. *Pickard*, 733 F.3d at 1302.

judicial document, subject to a presumption of public access, a court must then determine the weight to be given to the presumption. The weight varies with the significance of the document in the court's exercise of its Article III powers. Courts recognize that there is a spectrum of documents of varying significance that may be submitted to a court. Some are submitted only to determine their evidentiary relevance; here, the presumption would carry little weight. However, documents submitted for the court's consideration in determining the parties' substantive rights would carry a heavy presumption in favor of public access. *See, e.g., Stern v. Cosby*, 529 F.Supp.2d 417, 420 (S.D.N.Y. 2007). Documents submitted by the party moving for, or opposing, summary judgment "should not remain under seal absent the most compelling reasons." *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982).

The party opposing disclosure of a judicial document must articulate a "significant government interest" in keeping the document sealed. *Pickard*, 733 F.3d at 1303. If the government identifies such an interest, the court must weigh the governmental interest versus the public interest presumption. The burden is on the government to offer a compelling reason for keeping the document sealed. *See id.*[13]

---

[13] The language in *Pickard* concerning a "significant interest" is consistent with earlier Tenth Circuit cases regarding the common law right of access standard, *e.g., Colony Ins., supra; U.S. v. Hickey*, 767 F.2d 705 (10th Cir. 1985). Courts seem to draw a distinction between a "significant government interest" that would be sufficient to outweigh the public's common law right of access, and a "compelling governmental interest" which is required to overcome the public's constitutional right of access. *See, Riker v. Federal Bureau of Prisons*, 315 Fed.Appx. 752, 754-57 (10th Cir. 2009). In *Pickard*, however, the Court appears to use the words "significant" and "compelling" interchangeably

In *Pickard*, the court reversed the lower court's decision not to unseal certain documents. One factor in the court's decision was the trial court's failure to consider a less restrictive means, such as redaction or partial unsealing, to serve the government's interest. *Id.* at 1304.

## 2. Constitutional Right of Access

The United States Supreme Court has recognized a constitutional right of access to criminal trials and related courtroom proceedings. *See Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596 (1982) (criminal trial); *Press-Enterprise Co. v. Superior Court of California, Riverside County*, 464 U.S. 501 (1984) (*Press-Enterprise I*) (voir dire); *Press-Enterprise Co. v. Superior Court of California for Riverside County*, 478 U.S. 1 (1986) (*Press-Enterprise II*) (preliminary hearing); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) (plurality opinion) (criminal trial).

Less clear is the issue presented here: whether there is a constitutional right of public access to judicial *documents*. The Supreme Court has not explicitly recognized such a right, nor has the Tenth Circuit. *See U.S. v. McVeigh*, 119 F.3d 806, 811-13 (10th Cir. 1997). Nevertheless, most circuits that have addressed the question have found a First Amendment right of access to at least some judicial documents under some circumstances. *See Washington Post v. Robinson*, 935 F.2d 282, 287 (D.C.Cir. 1991) (plea agreement); *In re Search Warrant for Secretarial Area Outside of Gunn*, 855 F.2d 569, 573 (8th Cir. 1988) (affidavits supporting warrant); *U.S. v. Haller*, 837

when describing the nature of the government interest. *Pickard*, 733 F.3d at 1304.

F.2d 84, 87 (2d Cir. 1988) (plea agreement). *See also, Brigham Young Univ. v. Pfizer, Inc.*, 281 F.R.D. 507, 511 n.32 (D.Utah 2012) (collecting cases).

On several occasions, the Tenth Circuit has faced the question of whether there is a constitutional right of public access to judicial documents but found it unnecessary to decide the matter. In *McVeigh*, for example, the Tenth Circuit stated "[a]lthough we have held that there is at least a common law right of access to court documents, we have not previously decided, nor do we need to decide in this case, whether there is a First Amendment right to judicial documents." *Id.* The following year, in *U.S. v. Gonzales*, 150 F.3d 1246 (10th Cir. 1998), the Tenth Circuit noted that it had "rejected the argument that such a right exists as to certain court documents," while leaving open the question of whether a constitutional right might apply to other court materials. *Id.* at 1256. In 2013, the Circuit again addressed, without resolving, the constitutional access question. In *Pickard*, the court examined a convict's right to access the Drug Enforcement Agency's ("DEA") file on a confidential informant for use in ongoing litigation. The court again found that it had no need to reach the constitutional question: "Because we conclude that Defendants can seek to have the DEA records unsealed under the common law, we have no occasion here to address whether they also have a First Amendment right to have the DEA file unsealed." 733 F.3d at 1302, n.4.

Thus, the Tenth Circuit has neither expressly recognized nor expressly rejected a constitutional right of access to judicial documents. However, this Court has recognized a qualified constitutional right of public access to judicial

documents. Thirty years ago, this Court discussed the inherent dangers in

limiting public access to judicial documents:

> If the government is given the unfettered discretion to decide what
> information to make available to the press and the public, it has
> the power to distort the information and hide the truth. The first
> amendment guarantees of free speech and free press protect our
> right to freely criticize the government without fear of censorship
> by the government. But censorship in speaking and publishing is
> not the only form of censorship that must be prevented. The
> process of filtering information – selectively releasing some
> information while withholding other information – can be effectively
> used to prevent criticism and hide mistakes. *The first amendment
> guarantees apply to both forms of censorship.*

*Soc'y of Professional Journalists v. Secretary of Labor*, 616 F.Supp. 569, 576 (D.

Utah 1985), *appeal dismissed*, 832 F.2d 1180 (10th Cir. 1987) (emphasis

added).

Two years later, in *Soc'y of Professional Journalists v. Briggs*, 675

F.Supp. 1308 (D.Utah 1987), the court addressed whether the public has a

constitutional right of access to an executed settlement agreement in a case

involving alleged wrongdoing by public officials. There the court stated

emphatically that "there is a constitutional right of access to public

documents." *Id.* at 1310 (basing right on First Amendment and Utah state

law).

Based on the 4circumstances presented here and the relevant case law, I

believe that there is a First Amendment right of access to the judicial

documents at issue here in the circumstances before the Court.[14]

---

[14] To be clear, this Order finds that under either the common law right of
access or the constitutional right of access, the 24-second, pixelated courtroom
video must be unsealed.

Recognition of a constitutional right of access directs the court to two tests to determine whether the public and press should receive First Amendment protection in their effort to access certain documents in a particular case. The first is the so-called "experience and logic" test, which requires the court to consider both whether the documents "have historically been open to the press and general public" and whether "public access plays a significant positive role in the functioning of the particular process in question." *See Lugosch*, 435 F.3d at 120 (*quoting Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 92-93 (2d Cir. 2004)). The second test considers the extent to which the documents at issue are "derived from or are a necessary corollary" of the right to attend the relevant proceedings. *Hartford Courant*, 380 F.3d at 93.

The constitutional right of access is not absolute; however, the test to overcome the presumption of access is rigorous. In *Press-Enterprise I, supra*, the Supreme Court stated:

> The *presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.* The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

464 U.S. at 510 (emphasis added).

## V. DISCUSSION

The decision to seal a judicial document is a matter left to the sound discretion of the district court. *See Nixon*, 435 U.S. at 599. A reviewing court

will, however, "review de novo the legal principles that the district court applied in considering such a motion," and "applying incorrect legal principles is an abuse of discretion." *Pickard*, 733 F.3d at 1302. This Court has recognized a qualified constitutional right of access to judicial documents. *Briggs*, 675 F.Supp. at 1310. In *B.Y.U.*, this Court stated that it agreed with the principles set forth in *Lugosch*, 435 F.3d 110, *supra*, in determining the right of access to judicial documents. Based on the Court's statements in *B.Y.U.*, I conclude that the principles of *Lugosch* provide the proper framework for resolving the sealing/unsealing issue presented in this case. Furthermore, in *Pickard*, the Tenth Circuit used a procedure consistent with the principles of *Lugosch*.

Additionally, the Court notes that Judge Shaffer's interim protective order (ECF # 32) does not make an initial determination regarding the propriety of sealing the video. Thus, the video is currently under seal only until Defendant's initial motion (ECF # 12) is resolved. For purposes of applying the *Pickard* test, the burden is on Defendant to demonstrate that it has a compelling governmental interest that outweighs the heavy presumption in favor of access. Furthermore, the court must consider whether selective redaction would "adequately serve the government's interest." *Pickard*, 733 F.3d at 1304. *See also*, *Bus. of Custer Battlefield Mus.*, 658 F.3d 1188, 1195 & n.5 (9th Cir. 2011) (noting that "[i]n many cases, courts can accommodate [the government's] concerns by redacting sensitive information rather than refusing to unseal the materials entirely.").

1.    **Is the video a "judicial record"?**

The Court finds that there is little doubt that the courtroom videos at issue herein are judicial documents.

As the Court noted in *Bernstein*, *supra*:

> In determining whether a document is a judicial record, we evaluate the "relevance of the document's specific contents to the nature of the proceeding" and the degree to which "access to the [document] would materially assist the public in understanding the issues before the ... court, and in evaluating the fairness and integrity of the court's proceedings."

814 F.3d at 139-40 (*quoting Newsday LLC v. Cty. of Nassau*, 730 F.3d 156, 166–67 (2d Cir.2013).

Documents submitted to the court in support of a summary judgment motion fall within the First Amendment right of access under the experience and logic test because "summary judgment adjudicates substantive rights and serves as a substitute for a trial." *Rushford*, 846 F.2d at 252. Furthermore, adjudication is a "formal act of government" which, absent exceptional circumstances, should be subject to public scrutiny. *Joy*, 692 F.2d at 893. The courtroom videos were submitted to the Court as a basis for its determination of the parties' rights on a Motion for Summary Judgment. Both sides *and* the Court have indicated that the courtroom video is critical to determination of the substantive issues before the Court. Furthermore, the U. S. Supreme Court has noted the importance of a video account of events in the adjudication of parties' interests. *See Scott v.* Harris, 550 U.S. 372, 378-81 (2007) (court need not view facts in light most favorable to party opposing

summary judgment where that party's story is "blatantly contradicted by the [video] record, so that no reasonable jury could believe it.").

Contested documents, "by virtue of having been submitted to the court as supporting material in connection with a motion for summary judgment," are judicial documents under the common law, and there is a "qualified First Amendment right of access to documents submitted to the court in connection with a summary judgment motion." *B.Y.U.*, 281 F.R.D. at 511 (*quoting Lugosch*, 435 F.3d at 124). *See also FTC v. Standard Fin. Mgt. Cor.*, 830 F.2d 404, 409 (1st Cir. 1987); *Rushford*, 846 F.2d at 253; *San Jose Mercury News, Inc. v. U.S. Dist. Court*, 187 F.3d 1096, 1102 (9th Cir. 1999); *Lonker v. Chambers*, 2017 WL 1197640, *2 (D. Kan. Mar. 31, 2017) ("Without question, documents submitted … in connection with a summary judgment motion constitute 'judicial records' to which a strong presumption of public access attaches.") (*quoting Lugosch*); *In re "Agent Orange" Prod. Liability Litig.*, 98 F.R.D. 539, 545 (E.D.N.Y. 1983).

The video is not a mere incidental document passed between the parties during discovery. It is the key document for the Court to use in deciding the merits of this case. Under the experience and logic test, the video is a judicial document. Furthermore, since summary judgment may result in a full adjudication of the parties' rights, without any public trial, access to the video may well offer the public its only opportunity to determine the basis for the court's decision. There can be no serious question that the courtroom video at issue is a judicial document.

**2.     What weight should the Presumption of Access be Given?**

There is a strong presumption that judicial documents are accessible to the public.  *See Pickard*, 733 F.3d at 1302.  The weight to be afforded this presumption of access is determined "by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts."  *U.S. v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995).  The presumption of access to documents submitted in support of, or in opposition to, a motion for summary judgment is great.  *Lugosch*, 435 F.3d at 120; *Joy*, 692 F.2d at 893 (the basis for adjudication, absent exceptional circumstances, should be subject to public scrutiny).  The weight is not affected by whether the trial court actually relied on the document in adjudicating the case.  *Lugosch*, 435 F.3d at 121-23.  The weight afforded the presumption is determined by the role the document was intended to play in the exercise of the court's Article III duties.  *Id.*  Here, the presumption of public access must be given great weight.

**3.Balancing the Competing Considerations Against Public Access**

The presumption in favor of public access can be overcome by compelling "countervailing" factors.  Here, the Defendant offers four categories of countervailing interests that it contends overcome the presumption of access and require the Court to seal the courtroom videos.

**a.  Contractual Considerations**

Defendant argues that a Memorandum of Understanding ("MOU") between the Administrative Office of U.S. Courts ("AOUSC") and the U.S.

Marshal's Service ("USMS") restricts public access to the courtroom video. Thus, release of the video to the public would breach the agreement between the AOUSC and the USMS as to use of the video. The Court rejects this argument. The video in question depicts a sequence of events culminating in a fatal shooting that took place in a U.S. courthouse, by a public employee, during a public criminal trial. The articulated contractual concerns pale in comparison to the public interest in this matter – a matter that was fully open and viewable by the public in the first instance.

The MOU is not a sufficiently compelling countervailing interest to outweigh the public's right of access to such an important document.

### b. Courtroom Security and Security Procedures

Defendant contends that disclosure of the courtroom video will compromise court security by revealing:

- "blind spots" not viewable by the courtroom security camera;
- emergency evacuation procedures;
- positioning of court security personnel; and,
- emergency response protocols.

In addition, Defendant also argues that the law enforcement privilege protects the identities of law enforcement personnel and others in the courtroom at the time of the shooting and further protects "law enforcement procedures" attached to courtroom security measures implemented in the courthouse.[15] (ECF #12 at 9). The Government also argues that the written

---

[15] Although the Defendant raises the law enforcement privilege in their motion, they did not offer argument in support of the privilege during the August 29, 2017, hearing.

descriptions of the courtroom video as set forth in the pleadings herein, are sufficient to satisfy the public's right of access.[16]

Security and safety are significant governmental interests that must be taken seriously. However, the pixelated video viewed by the Court does not compromise security or safety. The video simply does not reveal any sensitive procedures. Within the span of 24 seconds, it shows the defendant's actions in the courtroom during testimony and his shooting by a Deputy U.S. Marshal. The Government has not identified any sensitive emergency procedures or protocols revealed in that brief time period. Furthermore, the pixelated video obscures the identities of security personnel. This renders moot the issue regarding identification of court personnel.

Even if there were some marginal impact on security procedures, the Court finds this impact not sufficiently compelling to overcome the presumption of public access. The redacted version of the courtroom video

---

[16]     Defendant has cited the undersigned's ruling in *Burke v. Glanz*, 2013 WL 211096 (N.D.Okla. Jan. 18, 2013) to support this argument. There, I rejected an effort by Plaintiff to modify a stipulated protective order and let Plaintiff's counsel unilaterally select documents to give the U.S. Department of Justice to encourage a possible action against the Defendants. The Plaintiff argued in part that the public had a right of access to pre-trial discovery in public interest litigation. *Id.* at *4. However, *Burke* presented different circumstances than we find here. First, in *Burke* the parties had voluntarily agreed to a protective order restricting use of documents. *Id.* at *1. Second, the party supposedly interested in the protected documents – the U.S. Department of Justice – had not intervened for that purpose. *Id.* at *3. Third, the documents at issue in *Burke* were not judicial documents – they had not been submitted to the Court for purposes of adjudication of any issue. *Id.* at *5 (citing the general proposition that "there is no public right of access to evidence obtained in the discovery process prior to use in public hearings or trial.") (*quoting Grundberg v. Upjohn Co.*, 140 F.R.D. 459, 466 (D.Utah 1991).

These differences render *Burke* inapposite.

sufficiently protects the Government's concerns. Furthermore, courtroom cameras can be repositioned. Additional cameras can be added to correct for blind spots. Evacuation and emergency response procedures can be amended, and positioning of security personnel can be altered. There is no record evidence indicating that any of this is unfeasible or prohibitively expensive.[17] Additionally, the courtroom generally is a public space; therefore, anyone can attend a public court proceeding and see where security personnel are stationed and where the judge, jury, and parties enter and exit the courtroom. The video does not disclose information that is not already publicly available.

The Court also rejects the Defendant's argument that the law enforcement privilege applies here. By Defendant's own admission in its motion, the law enforcement privilege applies primarily to protect the integrity of investigatory files. (ECF # 12 at 9) (*quoting United States v. Winner*, 641 F.2d 825, 831 (10th Cir. 1981)). The privilege may also extend to protection of law enforcement techniques, confidential sources, witnesses and law enforcement personnel "to prevent interference with an investigation." *In re M & L Bus. Mach. Co., Inc. v. Bank of Boulder*, 161 B.R. 689, 693 (D.Colo 1993). The courtroom video poses no threat to an ongoing investigation. It does not disclose confidential sources or witnesses or investigatory files. The courtroom was open to the public for Angilau's trial. The events that transpired did not suddenly become confidential because they were unexpected. Furthermore,

---

[17] At the August 29, 2017, hearing, Defense counsel expressed a desire to submit additional evidence to the Court as to the feasibility of adding courtroom cameras or moving their location. No such evidence was submitted.

although the privilege may apply to protect witnesses or law enforcement officers themselves, *see* 5 U.S.C. § 552(b)(7)(F), the privilege is a qualified privilege and must be weighed "against the need of the adverse party,*" See Tuite v. Henry*, 181 F.R.D. 175, 176-77 (D.D.C. 1998), or the public's interest in protecting the flow of information. *See Roviaro v. U.S.*, 353 U.S. 53, 62 (1957). And this balancing test must be undertaken "with an eye towards disclosure." *Tuite*, 181 F.R.D. at 177.

Here, the Court's security measures are on display in every public court proceeding. Those measures can likely be altered or intensified as necessary. The Government's claim that disclosing the courtroom video will irreparably harm courthouse security procedures is unpersuasive. There is no record evidence to indicate that security procedures cannot be amended or augmented as necessary. The Court finds that the privilege – even if applicable – does not outweigh the public's right to know what happened in the courtroom on April 24, 2014.

### c. Personal Privacy and Security

Defendant argues that making the courtroom video public will compromise the personal privacy and security of those persons in the courtroom at the time of the shooting including court personnel, witnesses, jurors, Courtroom Security Officers, and Deputy U.S. Marshals. This is a serious concern, but the Court finds there are less restrictive means than a broad sealing Order to balance the competing interests here. Release of the pixelated version of the 24-second courtroom video satisfies both interests.

First, the faces of jurors are not shown on either the pixelated or un-pixelated 24-second videos. Second, the pixelated version of the courtroom video obscures the faces and identities of all personnel in the courtroom. Pixilation of the video relieves the personal privacy/security concerns while still offering the public information as to what transpired in the courtroom when Angilau was shot. Under the reasoning of *Pickard*, this less restrictive solution is adequate to reconcile the competing interests before the Court.

### d. Identification of Jane Doe and Law Enforcement Personnel

Defendant argues that the video must be sealed in order to protect the identity of Jane Doe and other law enforcement personnel because TCG may seek revenge for the shooting. (ECF # 12). Defendant contends that even the pixelated version of the video places these individuals at risk. *Id.* In support of this argument, the Defendant cited the public security precautions taken before the trial and immediately after, including seating the jury anonymously and sealing the United States' witness list in the criminal case. *Id.* After the trial, the U.S. Marshal provided protection details to the judge and the judge's family and to the prosecuting attorneys, in response to TCG's threats against them. Deputy U.S. Marshals also gathered intelligence of threats against members of their own service, including Jane Doe. *Id.* As a result, six Marshals were temporarily relocated, for periods of time ranging from one week to thirty days. *Id.* The Defendant submitted additional evidence of these threats to the Court through an *in camera* submission. (ECF # 35). The Government contends that the precautions that were taken immediately before

and after the courtroom shooting establish the serious nature of the TCG threat and the need for continued sealing of the video.

The Court does not dispute the reasonableness of security measures taken at the time of trial and in the aftermath of the shooting three-and-a-half years ago. However, in balancing the competing interests before it, the Court must determine whether releasing the courtroom video in some form *today* poses an ongoing threat to the safety of the individuals involved. At least one court has recognized that security concerns arising in the heat of a specific incident may become stale over time. In *Thomas v. State of Colorado*, 2015 WL 6172185, *2 (D.Colo. Oct. 21, 2015), Plaintiff-inmate sought to seal certain documents in his civil lawsuit, contending that allowing the public to see the documents "would put his life in danger." *Id.* at *1. Plaintiff stated that "all the gangs in Colorado" had put a "hit" on him. *Id.* In determining whether the documents should be sealed, the Court noted that Plaintiff had not been assaulted or harmed since the filing of his complaint three years earlier. *See id.* Similarly, here the Defendant has submitted documents for *in camera* review supporting their contention that release of the courtroom video would reveal the identities of individuals whom the TCG has threatened. However, the latest of these specific threats was in 2014. There is no evidence of any specific threats or any harm to any of these individuals from 2015 to the present.

The Defendant did submit a supplemental *in camera* filing on June 17, 2017, in response to the Court's request for any additional information

regarding the Defendant's motion to seal. (ECF # 67).  In the Court's estimation, the incident does not reflect a specific credible threat against law enforcement.  Rather, it memorializes a generalized rant by a criminal defendant against law enforcement, his wife, and his wife's family.  The Court finds that this is insufficient to establish a specific threat against any of the law enforcement officers involved in this case. Rather, the submission establishes, at best, what the Court and the U.S. Marshal already know – criminals harbor hostility for law enforcement officers. Again, the pixelated video does not reveal any law enforcement officer or make him/her more vulnerable.

The staleness of the latest threat and the current generic evidence of the TCG ongoing threat are simply insufficient to meet the Government's heavy burden in this case.

## 4.     Consideration of Less Restrictive Means

While the Court finds that the Defendant's concerns and the articulated governmental interest in sealing the courtroom video do not outweigh the public's interest in access to a judicial document, the Court does find, pursuant to *Pickard*, that some restrictions on the release of the courtroom video are appropriate.  The pixelated 24-second courtroom video is sufficient to inform the public of what happened when Angilau was shot.  Thus, there is no need or justification for releasing the full video contained in ECF #36, Attach. #3/Exh. "A".  That video would reveal the identities of court and law enforcement personnel for no discernible public benefit.  The Intervenors have represented to the Court, both in writing and at the hearing, that they have no

interest in learning the identity of Jane Doe or other law enforcement personnel and, therefore, have requested only the pixelated version of the courtroom video. (ECF # 20, 96). Plaintiffs have argued that the un-pixelated versions of the video should be released. Plaintiffs' chief argument is that many people already known who Jane Doe is.

The Court has viewed both the pixelated and un-pixelated videos multiple times and has determined that the pixelated version is clear enough to depict the series of events and the crucial moments of the shooting. The Court finds that the Intervenors' request for the pixelated video is reasonable. Releasing the pixelated, 24-second version of the courtroom video satisfies the obligation to provide public access to judicial documents while protecting the governmental interest in the safety of the law enforcement and courtroom personnel involved. The concerns raised by the Government are not sufficiently compelling to overcome the public's right of access to at least the 24-second pixelated video.

## VI. CONCLUSION

For the reasons set forth, the Court finds that Defendant's Motion for Leave to File a Video Under Seal (ECF #12) should be **GRANTED IN PART AND DENIED IN PART** and Plaintiffs' Motion to Unseal the video (ECF #48) is **GRANTED IN PART AND DENIED IN PART**. The Court **ORDERS** that the pixelated, twenty-four second courtroom video with synched audio, submitted as part of Defendant's Motion to Dismiss for Failure to State a Claim (ECF # 36, Attach. #8/Exh. "F") be unsealed and made available to the public.

However, this Order is **STAYED** under December 13, 2017.  The other videos and exhibits submitted as attachments to ECF #36 shall remain under seal until further order of the Court. This Order supersedes the Interim Order issued in December 2016 (ECF #32).

**APPEAL or OBJECTIONS HERETO**

Any appeal of or objection to his Order must be filed within 14 days of the date herein, i.e., by **December 13, 2017**.  The Court hereby **STAYS** the effect of this Order until that date.  By December 13, any party objecting to or appealing this Order must file its objection/appeal and, if desired, must seek a further stay of this Order in compliance with DUCivR 72-3(a).[18]

**If no objection/appeal is filed by December 13, *or* no motion for extension of the stay is filed pursuant to DUCivR 72-3(a), ECF #36, Attach. #8/Exh. "F" shall be made available to the public/media on December 14, 2017.**

**DATED** this 29th day of November, 2017.

_____
Paul J. Cleary
United States Magistrate Judge

---

[18]    DUCivR 72-3(a) provides:

Pending a review of objections, motions for stay of magistrate judge orders shall be addressed initially to the magistrate judge who issued the order.