# IN THE UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF UTAH, CENTRAL DIVISION

MAVENI ANGILAU, et al.,

    Plaintiffs,

v.

THE UNITED STATES OF AMERICA, et al.,

    Defendants.

Case No. 2:16-CV-00992-JED-PJC

## OPINION AND ORDER

Before the Court are the defendants' motions for summary judgment (Doc. 36, 37).[1] The Court conducted a hearing on the original motions and has considered all related filings and evidentiary submissions made by the parties. (*See* Doc. 36, 37, 78, 82, 83, 110).

**I.      The Evidence**

The following facts are undisputed, except where noted specifically. In April 2014, Siale Angilau was on trial in the District of Utah on three counts of a Second Superseding Indictment. The operative indictment alleged that Mr. Angilau and his co-defendants were members and associates of the Tongan Crip Gang (TCG), which was purportedly a criminal organization engaged in acts of violence, among other things. (Case No. 2:08-cr-758-TC, Doc. 114 at 2, 6-8). In addition to racketeering charges asserted in Count I, Mr. Angilau was also on trial on Count XVII, for allegedly assaulting two individuals with a dangerous weapon, and Count XVIII, for

---

[1] The motions were filed as dismissal motions or, alternatively, summary judgment motions. Because the motions are dependent upon evidentiary submissions, the Court previously determined that they would be treated as motions for summary judgment. The Court set a schedule for the completion of briefing and the plaintiffs' submission of any evidence they wished to present in opposition to the motions. (*See* Doc. 68).

discharging a firearm during a crime of violence. (*Id.* at 19-20). It is undisputed that the charges included allegations that Mr. Angilau fired at two Deputy Marshals. (*See* Doc. 78 at 13 [Response to 3]).[2]

Angilau's criminal trial commenced on April 18, 2014, with jury selection and opening statements. (*See* Case No. 08-cr-758-TC, Doc. 1612, 1614). Due to heightened security concerns, jurors were identified by number. Following jury selection and opening statements, the trial reconvened for the government to commence presentation of its case the following Monday, April 21, 2014. The courtroom proceedings were captured on an audio recording and a surveillance camera, and those recordings were preserved. The defendants have submitted those recordings of the day (Doc. 37-3 [Exhibit A], 37-4 [Exhibit B], 37-5 [Exhibit C]). The summary judgment record also includes still images from the video (Doc. 37-7 [Exhibit E, Disc 2] and 37-8 [Exhibit F, Disc 2]) and twenty-four (24) second excerpts of the video with audio, which depict the seconds immediately before, during, and after the events that are at issue in this case (Exhibit E, Disc 1; Exhibit F, Disc 1). For purposes of the motions, plaintiffs have admitted that those recordings and still images "are truthful, accurate, and authentic recordings of the events that transpired on April 21, 2014 that are the subject of [this] action." (Doc. 78 at 13-14). The courtroom proceedings were also transcribed (*see* Doc. 37-6 [Exhibit D]) and are an accurate and authentic recording of the events at issue. (*See* Doc. 78 at 14).

---

[2] Plaintiffs allege that Mr. Angilau was no longer a gang member, but was only a *former* gang member, and they object to the Court taking judicial notice of Mr. Angilau's underlying trial proceedings. (*See* Doc. 78 at 12-13). Whether he was a gang member or former gang member is not material to this Opinion. However, the Court may take judicial notice of the procedural posture of the criminal trial at which the events at the center of this case occurred. *See* Fed. R. Evid. 201; *United States v. Ahidley*, 486 F.3d 1184, 1192, n.5 (10th Cir. 2007). Plaintiffs' own Complaint references many aspects of the underlying proceedings. (*See* Doc. 2).

Mr. Angilau was in custody, but was unrestrained during trial. (*See* Doc. 78 at 13). V.T., a former TCG member, was the first witness at trial. Jurors were seated in the jury box to the left front of the witness stand, from the witness's perspective. (*See id.* at 15 [Response to 10]; Doc. 37-16; Doc. 37-10, Exhibit H). The presiding trial judge was seated on the bench immediately above and to the right of the witness stand, from the witness's perspective. V.T. was being questioned by a federal prosecutor about the TCG. V.T. was wearing leg shackles, a belly chain, and handcuffs while seated in the partially enclosed U-shaped witness stand, just feet from the jury box in front and feet to the right of a rear exit door to the courtroom. (*See* Doc. 37-10, Exhibit H). The front of the witness box was approximately fourteen feet, eight inches from the rear door of the courtroom, and the back of the witness box is less than seven feet from the rear door of the courtroom. (*Id.*).

Deputy United States Marshal Jane Doe was stationed in the courtroom to provide order and security during Mr. Angilau's trial on April 21, 2014. Doe had previously worked on TCG-related court proceedings and understood that safety had been a concern to the Marshal's Service. (Doc. 37-11). Doe was assigned to trial security and to the in-custody witness, V.T. (*Id.*). Doe had been instructed that Angilau and V.T. must be kept apart. (*See id.*). Doe was acting within the course and scope of employment and under color of law as a Deputy Marshal. (*See* Doc. 78 at 16-17 [Response to 16]). Doe was positioned between the witness stand, where V.T. was seated, and the jury. (Doc. 37-11 at 4).

Minutes after V.T. began to testify about the TCG, Angilau looked over his shoulder, rose up from his seat at the defense table, moved behind his defense attorney's chair, and grabbed a pen

or pencil off the table.[3] Armed with the writing instrument, Angilau ran by the prosecutor and reached the witness box in less than two seconds. The court reporter, seated next to the witness stand, backed the reporter's chair away from the area of the witness stand as Angilau approached. (Exhibit E, F at 9:23:39-41). An unknown person yelled "whoa, whoa, whoa, whoa" as Angilau bounded toward the witness stand, but Mr. Angilau did not stop. (*See* Exhibit E, F at 9:23:37-38; Exhibit D at p. 32, lines 13-14). Doe saw that Angilau was rushing at V.T. with a sharp, pointed object in his right hand. (Doc. 37-11 at 5). Angilau jumped over the witness stand, hands first, with an arm raised in a striking motion. While he was airborne with his feet off the floor, and with pen in hand, he swung his extended right hand up in a violent, aggressive manner toward V.T. (Doc. 78 at 17 [Response to 17]; *id.* at 24 [asserting that the video "shows Angilau diving over the front barrier of the witness stand toward the witness V.T., apparently with a pen in hand"]). Angilau's right hand moved as if he was prepared to stab V.T. (*Id.* at 17 [Response to 18]). Plaintiffs do not dispute that Angilau "attempted to attack the witness" (*see* Doc. 78 at 13), and that fact is obvious from the video and series of still images of the incident. (Exhibits E, F).

In an effort to avoid Angilau's attack, V.T. jumped up and backed out of the witness box, toward the rear door of the courtroom. During Angilau's attempted attack on V.T., Doe fired four shots from Doe's duty-issued gun, in rapid succession. (Exhibits E, F at 9:23:40-42). Each shot hit Mr. Angilau. Doe did not have any other weapon. (Doc. 37-17). Other law enforcement officials ran to the area of the witness stand where the shooting occurred, and an unknown person

---

[3] Throughout the briefing, plaintiffs take inconsistent positions as to whether Angilau was armed with a pen or pencil, at times denying that a "pen" was used, and at other times expressly acknowledging that Angilau was armed with a pen. (*Compare* Doc. 78 at 16 [arguing it may not have been a pen] *with id.* at 17 [admitting that Angilau "swung his extended right hand up in [a] violent, aggressive manner at V.T. . . with pen in hand"]; and *id.* at 31 [alleging that "Angilau was 'armed' with a ball-point pen"]).

4

or persons yelled at Mr. Angilau to "drop the pen, drop the pen out of your hand, drop it out of your hand." (*See id.*; Exhibits E, F at 9:23:49-52). All of Doe's shots were fired less than two seconds after Angilau began to cross over the witness stand, and all shots were fired while Angilau was airborne or moving.[4] Both the audio (Exhibit C) and the video with aligned audio (Exhibit E, F) establish that all four shots were fired in less than one and one-half seconds, as measured from the first shot to the last. (*See* Exhibit C at 37:15 to 37:17; Exhibits E, F at 9:23:40 to 9:23:42). Plaintiffs state that they dispute the timing of the shots, but they *admit* that those recordings and still images "are truthful, accurate, and authentic recordings" of the courtroom proceedings on April 21, 2014. (Doc. 78 at 13-14).[5]

## II. Summary Judgment Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for a nonmoving party." *Anderson*, 477 U.S. at 248. The courts thus determine "whether the evidence

---

[4] Plaintiffs object to the description of Angilau as being "in motion" and contend that the phrase is "vague and ambiguous." (Doc. 78 at 18). The Court disagrees. Angilau's legs and/or arms were in motion during the few seconds of the video during which shots were fired. During that time, V.T. also continued to move away from Angilau. (*See* Exhibits E, F, at 9:23:40-42).

[5] Although plaintiffs admit that the recordings are accurate and authentic recordings of the events, they re-urge their assertion that discovery "would have been helpful." (Doc. 78 at 14). The Court addressed that argument in a prior Order, noting that plaintiffs had conferred with an expert and had received the audio and video months earlier, but had failed to conduct any forensic review to challenge or counter the alignment of the video and audio. (Doc. 68). The Court permitted plaintiffs an additional month to provide any such evidence (*see id.* at 7), but they failed to do so. Moreover, throughout the proceedings, plaintiffs have themselves relied upon the aligned video with audio. (*See, e.g.,* Doc. 78 at 4, 24-25, 28-30; Doc. 2 at ¶ 32).

5

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. All justifiable and reasonable inferences from the evidence are to be drawn in the non-movant's favor. *Id.* at 255.

## III. Discussion

### A. Deputy Doe's Motion

Doe moves for summary judgment on grounds of qualified immunity. Where a summary judgment motion is premised upon an assertion of qualified immunity, "the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009) (citations omitted). As with all motions for summary judgment, the Court will construe the facts in the light most favorable to the nonmoving party. *Id.* However, "a plaintiff's version of the facts must find support in the record," *id.*, and "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

#### 1. Constitutional Violation

A claim of excessive force is analyzed under the "objective reasonableness" standard applicable to Fourth Amendment claims. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Under that standard, the question is "whether the [officer's] actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. Whether force was reasonable "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" because "officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and

rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-397.

In determining the objective reasonableness of an officer's use of force, the courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. That balancing includes consideration of the totality of the circumstances, including non-exclusive factors such as the severity of the crime, whether the suspect posed an immediate threat to the safety of officers or others, and whether the suspect was actively resisting arrest or attempting to flee. *See id.*; *Thomson*, 584 F.3d at 1313. In addition, the Supreme Court has considered the suspect's own culpability in bringing about the officer's use of force. *See Scott*, 550 U.S. at 384 ("We think it appropriate in this process to take into account not only the number of lives at risk, but also their relative culpability. It was respondent, after all, who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight that ultimately produced the choice between two evils that [the officer] confronted. . . . By contrast, those who might have been harmed had [the officer] not taken the action he did were entirely innocent.").

Plaintiffs here argue that Doe's use of deadly force was unreasonable. The use of deadly force is reasonable where an officer in the defendant officer's position would have had probable cause to believe that there was a threat of serious physical harm to others. *Thomson*, 584 F.3d at 1313; *Plumhoff v. Rickard*, __ U.S. __, 134 S. Ct. 2012, 2021 (2014); *see also Scott*, 550 U.S. at 386. Having carefully reviewed the video of Mr. Angilau's swift flight from counsel table, his vault over the witness stand with pen in hand, and his attempt to violently attack the shackled witness, the Court has little difficulty determining that Doe's use of force to immediately stop Angilau's attack was objectively reasonable under the totality of the circumstances. An officer in

7

Doe's position would have had probable cause to believe that Angilau posed a threat of serious physical harm to others. The entire incident was only seconds-long. Angilau, who was in custody, fled the defense table, reached the witness stand in less than two seconds, and did not cease his progress. Doe saw Angilau rushing V.T. with a sharp, pointed object in hand. Angilau's rapid movement and attack placed Doe in a position of having to make a split-second decision. Doe did not carry any other weapons. Both Doe and V.T. were effectively boxed into a corner between the witness stand and the jury box, which left no room to safely escape any continuing attack by Angilau without also placing others in the courtroom in danger. While Angilau's attack was directed at the witness, there were other innocent bystanders (the presiding trial judge, court reporter, jurors, and Doe) in harm's way if Angilau's attack had not been immediately stopped.

According to the plaintiffs, the severity of the crime was "mild," no one was at risk when the last three shots were fired, and Angilau was not resisting or evading officers. (Doc. 78 at 25, 31-33). Contrary to the plaintiffs' assertions, the word "mild" simply cannot be used to describe the situation in which an in-custody defendant leaves counsel table, grabs a pen from the table, runs across the courtroom, and leaps over the witness stand making a stabbing motion to attack an adverse witness who is shackled and in close proximity to other innocent bystanders. The circumstances also reflect that Angilau was attempting to attack the witness while evading the physical control and custody of the United States Marshal Service and any other courtroom officials. The attack was unsuccessful because of the shots that Doe fired, which stopped Angilau from harming the witness or others within the zone of danger.[6]

---

[6] Plaintiffs attempt to downplay the danger posed by a pen or pencil. The defendants have cited numerous authorities for the proposition that many objects, including pens and pencils, can be utilized as weapons. (*See* Doc. 36 at 26-27). The Court agrees, particularly in light of the violent and forceful stabbing motion that Angilau was using as he jumped over the front of the witness stand.

The plaintiffs also argue that, even if the initial use of deadly force was permissible, Doe acted unreasonably in firing more than one shot at Angilau. The Supreme Court has rejected a similar argument, noting, "It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Plumhoff*, 134 S. Ct. 2022 (officers acted reasonably in using deadly force, including firing a total of 15 shots). In *Plumhoff*, the Court noted that all 15 shots in that case were fired during a 10-second span and officers had not "initiated a second round of shots after an initial round had clearly incapacitated [the fleeing suspect]." *Id.* The video and audio of Angilau's attack and the shooting establish that Doe first fired Doe's service weapon less than one second after Angilau began to cross over the witness stand, and all four of Doe's shots were fired in rapid succession, *in less than one and one-half seconds*, from the first to the last shot, while Angilau was airborne postured to attack or was still in motion. As in *Plumhoff*, there was no second round of shots after Angilau was clearly incapacitated.

The Court also considers Mr. Angilau's culpability. Angilau intentionally fled the defense table to attack the witness with a pen, and his actions placed the witness, as well as other innocent bystanders just feet away, in harm's way. The attack was entirely unprovoked. It was thus Angilau whose actions required Doe to make a split-second choice whether to end the attack or risk that Angilau would seriously harm V.T. or others in the courtroom. *See Scott*, 550 U.S. at 384 ("It was respondent, after all, [whose actions] ultimately produced the choice between two evils that [the officer] confronted").

The plaintiffs argue that the last three shots were fired into Angilau's back after he was on the floor, not moving and "likely disabled," and was "no longer any danger to the witness." (*See* Doc. 78 at 4-7). In the Complaint, the plaintiffs similarly alleged that, "[a]fter dropping [Angilau]

9

to the ground with the first gunshot, [Doe] approached the witness box and shot [Angilau] three more times in the back, from close range. [Angilau] was no longer a threat when shots 2, 3 and 4 were fired." (Doc. 2 at 8, ¶ 25; *see also id.* at 17, ¶ 54 [alleging that Doe "essentially stood over and shot [Angilau] in the back three additional times as [he] was lying face down"]). The plaintiffs also assert that, at the time of the first shot, "halfway between 9:23:40 and 9:23:41 . . . the attempted attack on V.T. is over, and V.T. is out of harm's way, as Angilau lands on the floor in a heap" after Doe's first shot. (Doc. 78 at 24).

The video and audio refute plaintiffs' strained construction of the facts. Doe fired all four shots in under two seconds. There is no discernable pause and restart of the shooting. The four shots were fired in swift succession. Plaintiffs' claim that Doe should have made a judgment at the halfway mark between one second and the next ("halfway between 9:23:40 and 9:23:41") is asking the Court to view Doe's actions with "20/20 vision of hindsight," which is not permissible. *See Graham*, 490 U.S. at 396-397. Rather, the Court must view Doe's actions from the "perspective of a reasonable officer on the scene . . . often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.*

The plaintiffs' argument that V.T. was "safe and out of the way" is also inconsistent with the video and with plaintiffs' admission that V.T. was only "approximately seven feet away" from the witness stand "when shots 2-4 were fired." (Doc. 78 at 20, ¶ 24). Although V.T. was moving out of the way, he was shackled, and there was little area for him to continue to retreat from the witness stand in that corner of the courtroom. The claims in the Complaint – that Doe took one shot, then approached the witness stand and stood over Angilau, firing three more shots into his

10

back from close range – are also directly contradicted by the video. Doe was moving *away* while firing the shots at Angilau. (*See* Exhibits E, F at 9:23:40-42).

The video completely contradicts plaintiffs' argument that Angilau stopped posing a danger within less than one second of launching himself over the witness stand while making a stabbing motion with a pen in hand. Plaintiffs' construction of the evidence also ignores the presence of the nearby judge, jurors, and other court personnel who were in potential danger if Angilau were to continue his attack or turn his attention to others nearby. The Court cannot adopt the plaintiffs' version of the facts, because the video evidence clearly contradicts plaintiffs' version. *See Scott*, 550 U.S. at 378-80 (where a party's version of the facts is blatantly contradicted by a video, "so that no reasonable jury could believe [the contradicted version of facts], a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"); *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010) (a court need not adopt the plaintiffs' version of the facts where "there is clear contrary video evidence of the incident at issue," even where the video "did not capture everything"); *Green v. Post*, 574 F.3d 1294, 1296, n.4 (10th Cir. 2009) (stating material facts differently than the district court, based upon the Circuit's review of a video) (citing *Scott*, 550 U.S. at 378-79).

Under the totality of the circumstances, Doe's use of deadly force against Angilau was objectively reasonable and did not violate his Fourth Amendment rights. Doe is thus entitled to summary judgment.

2.    **Clearly Established Law**

Even had the plaintiffs presented evidence supporting a Fourth Amendment claim for excessive force, Doe would still be entitled to summary judgment based on qualified immunity, because the law was not clearly established at the time of the shooting that Doe's conduct was

unlawful. The Supreme Court has set a high bar to prove clearly established law, which requires that "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, __ U.S. __, 136 S. Ct. 305, 308 (2015). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "[I]f a reasonable officer might not have known for certain that the conduct was unlawful – then the officer is immune from liability." *Ziglar v. Abbasi*, __ U.S. __, 137 S. Ct. 1843, 1867 (2017).

The district courts are "not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, 134 S. Ct. at 2023 (internal citation omitted). Thus, the Supreme Court has held that the general excessive force standards set forth in *Tennessee v. Garner*, 471 U.S. 1 (1985) and *Graham*, 490 U.S. 386 do not by themselves create clearly established law outside "an obvious case." *White v. Pauly*, __ U.S. __, 137 S. Ct. 548, 552 (2017) (quoting *Brosseau v. Haughen*, 543 U.S. 194, 199 (2004)). This is not a case where it is "obvious" that Doe's use of force violated the Fourth Amendment. Accordingly, to establish that Doe's conduct violated clearly established law, the plaintiffs must "identify a case where an officer acting under similar circumstances as [Deputy Doe] was held to have violated the Fourth Amendment." *White*, 137 S. Ct. at 552. Satisfying the clearly established law component of the qualified immunity analysis ordinarily requires a Supreme Court or Tenth Circuit opinion on point or the clearly established weight of authority from other circuits must point in one direction. *Pompeo v. Bd. of Regents of Univ. of New Mexico*, 852 F.3d 973, 981 (10th Cir. 2017).

In support of their argument that the law was clearly established that Doe's actions violated Angilau's Fourth Amendment rights, the plaintiffs cite the general excessive force principles from

*Graham* and *Garner*. (Doc. 78 at 10-11). They also cite *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150 (10th Cir. 2010) for the proposition that the law "was clearly established in 2015 that a police officer could not use deadly force, if deadly force was not reasonably necessary." (Doc. 78 at 10-11).⁷ The plaintiffs' reliance on the general legal statements from *Graham*, *Garner* and *Zia Trust* is misplaced. First, as noted, the Supreme Court has rejected the use of *Garner* and *Graham* for clearly established law except in cases involving "obvious" Fourth Amendment violations. *See White*, 137 S. Ct. at 552. The Court is not authorized to define clearly established law at such a "high level of generality." *See White*, 137 S. Ct. at 552 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Second, the facts in *Zia Trust* bear no resemblance to the circumstances that Deputy Doe faced in the Utah courtroom. In *Zia Trust*, it was "not clear that [the decedent had] manifested an intent to harm [the officer] or anyone else" nearby. 597 F.3d at 1155. In contrast, it is undisputed that Angilau was attempting to attack a witness in a federal trial.

The plaintiffs also cite a general statement of law from *Cordova v. Aragon*, 569 F.3d 1183, 1192 (10th Cir. 2009) that "deadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others." (Doc. 78 at 34) (quoting *Cordova*, 569 F.3d at 1192). Pursuant to the Supreme Court's pronouncement, such general statements of Fourth Amendment law do not satisfy the "clearly established law" requirement of identifying "a case where an officer acting *under similar circumstances* as [Doe] was held to have violated the Fourth Amendment." *White*, 137 S. Ct. at 552 (emphasis added). Moreover, the Court has determined based on the undisputed evidence and the clear video evidence in the case that Doe's use of deadly force was objectively

---

⁷     The applicable date is April 21, **2014**, the date on which Angilau was shot.

reasonable because a reasonable officer in Doe's position would have had probable cause to believe that Angilau posed a threat of serious physical harm to others in the courtroom.

Doe is entitled to qualified immunity and summary judgment on the plaintiffs' claims.

**B.     United States of America's Motion**

The plaintiffs assert a claim for negligence against the United States under the Federal Tort Claims Act (FTCA). (Doc. 2 at 11). The plaintiffs' negligence claim is premised upon the same facts as their excessive force claim against Jane Doe. (*See* Doc. 2 at 12-13).

"[T]o establish governmental liability under the FTCA, a plaintiff must establish that the injury at issue was 'caused by the negligent or wrongful act or omission of any employee of the Government . . . under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *Gallardo v. United States*, 752 F.3d 865, 870 (10th Cir. 2014) (quoting *Harvey v. United States*, 685 F.3d 939, 947 (10th Cir. 2012)); *see* 28 U.S.C. § 2675. State law applies to resolve questions of substantive liability under the FTCA. *See Gallardo*, 752 F.3d at 870.

Both the United States and the plaintiffs request that the Court apply the standards found in Utah Code Ann. § 76-2-404. (Doc. 78 at 40; Doc. 37 at 18; *see also* Doc. 2 at 12). Pursuant to the statute, an officer is justified in using deadly force when "the officer reasonably believes that the use of deadly force is necessary to prevent death or serious bodily injury to the officer or another person." Utah Code Ann. § 76-2-404(1)(c). That standard is very similar to the standards applied to deadly force under the Fourth Amendment. *See, e.g., Thomson*, 584 F.3d at 1313 ("An officer's use of [deadly] force is reasonable only if a reasonable officer in [his or her] position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others.").

The Court has already determined that the undisputed facts establish that Doe's use of deadly force was reasonable because a reasonable officer in Doe's position would have had probable cause to believe that there was a threat of serious physical harm to others in the courtroom. (*See supra*, pp. 7-11). There is simply no genuine dispute of material fact on the issue of whether Jane Doe, or a reasonable officer in Doe's position, would reasonably believe that Angilau posed a threat of serious physical harm to others. It is undisputed that Angilau grabbed a pen (or pencil) from counsel table, ran to the witness stand, leapt over it, and was using the instrument in a violent, stabbing manner in an attempt to attack a witness who was restrained by a belly chain and hand and leg shackles. It is also undisputed that several additional innocent bystanders – including the presiding judge, the jury, and a court reporter, as well as Jane Doe – were just feet away from Angilau. Angilau was in custody, but he essentially had escaped custodial control for those seconds during which he was executing his plan to assault the witness. His attack was stopped by the shots that Jane Doe rapidly fired, in less than one and one-half seconds. The plaintiffs have not presented any evidence that would establish the existence of a genuine dispute of material fact regarding the reasonableness of Doe's use of deadly force. That force was reasonable under the undisputed evidence of this case.

The evidence in this case is "so one-sided that [the United States] must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. Thus, the United States is entitled to summary judgment on the FTCA claim.[8]

---

[8] For this reason, it is unnecessary to address the government's separate discretionary function exception argument.

## IV. Conclusion

The defendants' motions for summary judgment (Doc. 36 and 37) are **granted**.[9] A separate Judgment will be entered forthwith.

SO ORDERED this 9th day of March, 2018.

_____
JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE

---

[9] In their Complaint, plaintiffs named as additional defendants "John and Sally Does 2-10." (Doc. 2 at 1). However, the Complaint does not contain any factual allegations against any John Doe or Sally Doe, such defendants are not identified on the docket in this case, and the plaintiffs have not manifested any intent to prosecute any claims against any defendants other than the United States of America and Jane Doe. Any claims by the plaintiffs against unidentified John and Sally Does are hereby dismissed.